UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL ROBERT FLEETWOOD,　　　:
　　　　　　　　　　　　　　　　　:CIVIL ACTION NO. 3:17-CV-1796
　　　　　　　Plaintiff,　　　　　:
　　　　　　　　　　　　　　　　　:(JUDGE CONABOY)
　　　　　　　v.　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
NANCY A. BERRYHILL,　　　　　　　:
Acting Commissioner of　　　　　:
Social Security,　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　　Defendant.　　　　　:
　　　　　　　　　　　　　　　　　:

_____

**MEMORANDUM**

　　　Pending before the Court is Plaintiff's appeal from the Acting
Commissioner's denial of Disability Insurance Benefits ("DIB")
under Title II of the Social Security Act ("Act").  (Doc. 1.)
Plaintiff protectively filed an application on February 19, 2014,
alleging disability beginning on February 9, 2014.  (R. 18.)  After
Plaintiff appealed the initial April 22, 2014, denial of the
claims, a hearing was held by Administrative Law Judge ("ALJ")
Sharon Zanotto on April 19, 2016.  (*Id.*)  ALJ Zanotto issued her
Decision on May 24, 2016, concluding that Plaintiff had not been
under a disability, as defined in the Social Security Act ("Act")
from February 9, 2014, through the date of the Decision.  (R. 27.)
Plaintiff requested review of the ALJ's decision which the Appeals
Council denied on August 2, 2017.  (R. 1-7.)  In doing so, the
ALJ's decision became the decision of the Acting Commissioner.  (R.
1.)

　　　Plaintiff filed this action on October 4, 2017.  (Doc. 1.)  He

asserts in his supporting brief that the Acting Commissioner's determination should be reversed for the following reasons: 1) the ALJ erred at step three in finding Plaintiff did not meet listing 12.04 and 12.06; 2) the ALJ erred in concluding that Plantiff has the residual functional capacity ("RFC") to perform light-duty work; and 3) the ALJ erred when she concluded that other work existed in the national economy which Plaintiff could perform. (Doc. 9 at 4.)  For the reasons discussed below, the Court concludes Plaintiff's appeal is properly denied.

## I. Background

Plaintiff was born on September 16, 1980, and was thirty-three years old on the alleged disability onset date.  (R. 26.)  He has a high school education and past relevant work as a merchandise deliverer, laborer, lubrication technician, auto parts counter person, and kitchen helper.  (*Id.*)  Plaintiff alleged that his inability to work was limited by major depression, anxiety disorder, ADHD (predominantly inattentive type), and OCD.  (R. 172.)

### A.  *Medical Evidence*

In his supporting brief (Doc. 9), Plaintiff does not provide a factual background with citation to medical evidence of record. Rather, he provides citation to the record in the Argument section of his brief.  (Doc. 11 at 2-4.)  Defendant adopts the facts set out in the hearing decision and those stated in Defendant's

Argument context. (Doc. 10 at 4.) Thus, the Court will provide a general background derived from the record as relevant to the parties' arguments and ALJ's Decision.

Plaintiff testified that he became disabled on the alleged onset date of February 9, 2014, because he was hospitalized. (R. 24.) Hospital records show Plaintiff's girlfriend and sister sought involuntary inpatient psychiatric hospitalization on the alleged onset date. (*Id.* (citing R. 350-54).) They alleged Plaintiff threatened his child. (*Id.*) Involuntary hospitalization was denied because there were no identifiable features requiring inpatient hospitalization. (*Id.*)

Two weeks later, Plaintiff presented to Wellspan Behavioral Health where he had been going for medication management. (*Id.* (citing R. 328-41).) At the February 27, 2014, visit, with Todd Muneses, M.D., Plaintiff did not mention the February 9th hospital visit. Having previously been seen on January 28, 2014 (R. 334), Plaintiff reported that the increase in Wellbutrin had helped with energy and motivation and his outlook was slightly better though he continued to struggle with getting his days going. (R. 332.) Other than a depressed and anxious mood, Plaintiff's physical and mental status examination was normal. (*Id.*) Plaintiff was directed to increase Wellbutrin SR to 150 milligrams twice a day. (*Id.*)

At his March 11, 2014, Wellspan visit, Plaintiff reported

improvement with the Wellbutrin increase, stating that he felt calmer and more patient. (R. 330.) He also reported that he noticed improved energy and motivation, he was doing more activities of daily living and chores around the house, and he was eating and sleeping well. (*Id.*) Plaintiff denied any medication side effects or new medical problems. (*Id.*)

At his July 18, 2014, visit with Dr. Muneses, Plaintiff reported worsening symptoms Plaintiff noted that a therapist had recommended DBT treatment. (R. 373.) Plaintiff also said he would like to go back to work and was welcome by his employer, but he felt that his symptoms were continuing to interfere with his ability to work. (*Id.*) Other than depressed mood and distracted attention span, mental status exam was normal. (R. 374.) Dr. Muneses noted that Plaintiff was to return in two months to see a nurse for medication management and Dr. Muneses would see him in four months. (*Id.*)

In September 2014, Plaintiff reported no change in symptoms, he was having good days and bad days, he continued to want to try DBT but his appointment had been bumped, and he was working at Sam's Club. (R. 370.) Although Plaintiff also noted worsening anxiety symptoms, he reported his attention symptoms were overall improved, his energy was improved, and he was functioning ok at his job. (R. 371.) The provider recorded that Plaintiff was "not yet at baseline and does feel the current treatment is helping

somewhat.  Depression and anxiety remain a problem, but he is 'more functional than I've been in a long time.'  He is active with usual interests and functioning and further intervention is necessary to address his anxiety, he believes."  (*Id.*)

Plaintiff was seen for an acute visit on December 19, 2014, at which time he reported that his symptoms had worsened.  (R. 368.) Other than depressed mood, his mental status exam was normal.  (R. 367.)

In February 2015, Dr. Muneses noted that he had last seen Plaintiff over the summer.  (R. 366.)  Dr. Muneses recorded that Plaintiff stated his depression was significant in December but then he started a DBT program which resulted in significant improvement in his mood and outlook.  (*Id.*)  Dr. Muneses noted that Plaintiff felt that the DBT program had helped him deal with stressors in a much healthier way, he continued to feel the benefit of Adderall for his ADD, he had been able to reduce his need for Alprazalom for anxiety or panic symptoms, and he had been eating and sleeping better.  (R. 366.)  Plaintiff's mental status exam was normal, including euthymic mood.  (R. 366-67.)  Plaintiff was to return for a medication management appointment in four months.  (R. 366.)

On April 24, 2015, Plaintiff was seen earlier than his scheduled appointment due to worsening depression and anxiety and an increase in irritability and agitation.  (R. 362.)  He reported

5

that he felt a significant reduction in energy and motivation and he had been isolating himself in bed. (*Id.*) Plaintiff's mood was recorded to be depressed, anxious, and irritable, and the mental status exam was otherwise normal. (*Id.*) Dr. Muneses adjusted Plaintiff's medication regimen and directed him to return in a month for his medication appointment. (R. 362.)

In May 2015, Plaintiff reported some benefit from the change in medication and denied side effects. (R 359.) He also reported that he had done fairly well over the preceding month with the exception of a brief four-day period of increased depression. (*Id.*) Plaintiff said he was looking forward to an evaluation by vocational rehabilitation services "in order to possibly land a job or go back to school." (*Id.*) Other than a depressed and anxious mood, Plaintiff' mental status exam was normal. (R. 360.)

In July Plaintiff reported that his depression had worsened, he had panic attacks that occurred about twice a week with a two-hour duration, and he continued with stressors including problems with an ex-girlfriend and child custody. (R. 356.) Plaintiff said that he had met with vocational rehabilitation services but he told them that he was "not dependable in that if his depression symptoms are severe he would not show up for work." (R. 356.)

In August 2015, Plaintiff continued to report feeling depressed and anxious with no motivation and extremely low energy level. (R. 353.) Plaintiff reported that he had gotten calls from

two prior employers who wanted him to come back to work. (*Id.*)
Mental status exam was normal, including euthymic mood. (*Id.*)
Plaintiff was to return for medication management in six weeks.
(R. 352.)

A Wellspan Health record certification form dated January 18,
2016, completed in response to an attorney's request for records
from October 7, 2015, to the present indicates that no records
existed for Plaintiff for that time period. (R. 377.)

Plaintiff was seen by Brian J. Taylor, M.D., of Spring Valley
Medicine, on January 19, 2016. (R. 379.) Dr. Taylor recorded that
Plaintiff's blood pressure was high and his triglycerides were
extremely high which worried Plaintiff. (Id.) Dr. Taylor noted
that Plaintiff's "anxiety . . . is obviously very high right now."
(R. 379.) Plaintiff reported that he was so anxious that he
thought his depression was worsening. (R. 380.) Plaintiff was to
let his psychiatrist know about medication changes and return in
one month for lab and progress checks. (R. 379.)

Wellspan BH notes dated February 4, 2016, indicate an
adjustment in Plaintiff's medication regimen. (R. 433.)

At his February 26, 2016, office visit with Dr. Taylor,
Plaintiff reported that he was doing much better and was very happy
with the changes his psychiatrist had made to his medication
regimen. (R. 442.) Dr. Taylor noted that Plaintiff had "some
definite issues with his anxiety over the last couple months" and

medication changes had helped. (R. 443.) On physical exam, Dr. Taylor noted that Plaintiff was alert and in no acute distress.

**B.** *Opinion Evidence*

**1.** **Neuropsychosocial Evaluation**

On February 23, 2013, Daniel Aikins, Psy.D., conducted a Neuropsychosocial Evaluation on referral of the York Pennsylvania Office of Vocational Rehabilitation (OVR). (R. 274-84.) Plaintiff's mental impairment symptoms were reviewed and Dr. Aikin noted that Plaintiff evidenced severe depression, "crying mark[ed] his behavior," and "[a]nhedonia, agitation, irritability, indecisiveness, and fatigue all mark Michael's existence these days." (R. 285.) Plaintiff also endorsed anxiety symptoms. (*Id.*) Dr. Aikin questioned whether there may have been an over-endorsement of symptoms which was possibly a "cry for help." (*Id.*) His diagnosis included Depressive Disorder NOS, Anxiety Disorder NOS (possibly generalized anxiety disorder), and Cognitive Disorder NOS (memory problems, non-verbal deficits). (R. 287.) Dr. Aikin assessed a GAF of 55. (*Id.*) He also provided job recommendations including that Plaintiff should avoid jobs that were fast-paced and those that required attention to detail or multi-tasking. (R. 288.)

**2.** **State Agency Consultant**

John Gavazzi, Psy.D., a State agency reviewing consultant, completed a Psychiatric Review Technique ("PRT") and Mental

Residual Functional Capacity Assessment on April 16, 2014.  (R. 66-69.)  After concluding that Plaintiff's diagnoses of affective disorders and anxiety disorders were severe, Dr. Gavazzi determined that Plaintiff had no restrictions of activities of daily living, mild difficulties of maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration.  (R. 66.)  He assessed that plaintiff was not significantly limited in most areas but concluded he had moderate limitations in his ability to understand and remember detailed instructions, and his ability to carry out detailed instructions. (R. 68.)  In narrative form, Dr. Gavazzi explained that, based on Plaintiff's understanding and memory limitations,  he found Plaintiff could "understand, retain, and follow simple job instructions, i.e., perform one- and two-step tasks.  The claimant can perform simple, routine, repetitive tasks in a stable environment."  (*Id.*)  Based on Plaintiff's concentration and persistence limitations, Dr. Gavazzi opined that Plaintiff could "make simple decisions.  The claimant would be able to maintain regular attendance and be punctual.  The claimant is able to carry out very short and simple instructions."  (*Id.*)

3. **Treating Psychiatrist**

Todd Muneses, M.D., Plaintiff's treating psychiatrist, completed a Medical Source Statement of Ability to Do Work-Related

Activities (Mental) on April 25, 2015. (R. 343-45.) Dr. Muneses
concluded that Plaintiff's ability to understand, remember, and
carry out instructions were affected by his impairments: he had
moderate limitations in his ability to understand and remember
simple instructions, and his ability to carry out simple
instructions; he had marked limitations in his ability to make
judgments on simple work-related decisions, his ability to
understand and remember complex instructions, his ability to carry
out simple instructions, and his ability to make judgments on
complex work-related decisions. (R. 343.) These assessments were
based on Dr. Muneses findings that Plaintiff had "severe problems
with depressed mood, anxiety, poor attention & focus that all
interfere with his ability to carry out tasks in a work setting."
(Id.) Regarding his ability to interact appropriately with others
and respond to changes in a routine work setting, Dr. Muneses
opined that Plaintiff had moderate restrictions in his ability to
interact with the public, supervisors, and co-workers, and he had a
marked restriction in his ability to respond appropriately in a
routine work setting. (R. 344.) These assessments were based on
Plaintiff's "difficulty interacting in social settings whether at
work or at home. He has mood swings that cause irritability when
talking to a family member." (*Id.*) The form noted that the
identified limitations "are assumed to be your opinion regarding
current limitations only. However, if you have sufficient

information to form an opinion within a reasonable degree of medical or psychological probability as to past limitations, on what date were the limitations you found above first present?" (*Id.*)  Dr. Muneses did not fill in a date in the space provided. (*Id.*)

## C.    *ALJ Decision*

In her May 24, 2016, Decision, ALJ Zanotto concluded that Plaintiff had the following severe impairments: depressive disorder, anxiety disorder, and attention deficit hyperactivity disorder.  (R. 20.)  She found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment.  (R. 21.)  ALJ Zanotto then assessed that Plaintiff had the residual functional capacity ("RFC") to perform light work

> except he can perform work involving only
> repetitive, short cycle tasks with occasional
> decision making and occasional interaction
> with supervisors, co-workers and the public;
> but no jobs with precise limits, tolerances
> or standards; and no jobs involving
> directing, controlling or planning the
> activities of others or influencing other
> peoples' opinions, attitudes or judgments.

(R. 23.)   On the basis of this RFC, ALJ Zanotto determined that Plaintiff could not perform his past relevant work but jobs existed in significant numbers in the national economy that he could perform.  (R. 26.)  With this finding, ALJ Zanotto concluded Plaintiff had not been under a disability from February 9, 2014,

through the date of the decision.  (R. 27.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S.

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that jobs existed in significant numbers in the national economy which Plaintiff could perform. (R. 26.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence

13

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted). If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence

approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d

15

Cir. 1983) (internal quotation omitted).  Where a claimed error
would not affect the outcome of a case, remand is not required.
*Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).  Finally,
an ALJ's decision can only be reviewed by a court based on the
evidence that was before the ALJ at the time he or she made his or
her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

As set out above, Plaintiff asserts the Acting Commissioner's
determination should be reversed for the following reasons: 1) the
ALJ erred at step three in finding Plaintiff did not meet listing
12.04 and 12.06; 2) the ALJ erred in concluding that Plantiff has
the residual functional capacity ("RFC") to perform light-duty
work; and 3) the ALJ erred when she concluded that other work
existed in the national economy which Plaintiff could perform.
(Doc. 9 at 4.)

"The burden of showing that an error is harmful normally falls
upon the party attacking the agency's determination." *Shineski v,
Sanders*, 556 U.S. 396, 409 (1969); *Woodson v. Comm'r of Social
Security*, 661 F. App'x 762, 766 (3d Cir. 2016) (citing *Shineski*,
556 U.S. at 409) (a plaintiff must point to specific evidence that
demonstrates his claimed error caused harm); *Holloman v. Comm'r of
Social Security*, 639 F. App'x 810, 814 (3d Cir. 2016) (citing
*Shineski*, 556 U.S. At 409) (a plaintiff must show how the claimed
error made a difference beyond a mere assertion that it did so).

16

## A. Step Three

Plaintiff alleges that he had an impairment or combination of impairments that met or equaled one of the listed impairments under the "B" criteria in sections 12.04 and 12.06. (Doc. 9 at 5.) Defendant responds that the ALJ properly determined that Plaintiff did not have an impairment or combination of impairments that met or equaled Paragraph B of listings 12.06 and 12.06. (Doc. 10 at 5.) The Court concludes Plaintiff has not satisfied his burden of showing that the claimed error is cause for reversal or remand.

A claimant bears the burden of establishing that his impairment meets or equals a listed impairment. *Poulos v. Comm'r of Social Security*, 474 F.3d 88, 92 (3d Cir. 2007). Listing 12.04 (Affective Disorders) and listing 12.06 (Anxiety-Related Disorders) have A, B, and C criteria. Listing 12.04 is met if both the A and B criteria are met or the C criteria are met. Listing 12.06 is met if both the A and B criteria are met or both the A and C criteria are met. The issue here is whether the B criteria have been met. The paragraph B criteria are the same for both listings and a plaintiff must show that he satisfies at least two of the following criteria: 1) Marked restriction of activities of daily living; 2) Marked difficulties in maintaining social functioning; 3) Marked difficulties in maintaining concentration, persistence, or pace; or 4) Repeated episodes of decompensation. 20 C.F.R. pt. 404, subpt. P, App. 1 §§ 12.04(B), 12.06(B). "A 'marked' restriction or

difficulty is one that is more than moderate but less than extreme and that 'interfere[s] seriously with [the] ability to function independently, appropriately, effectively, and on a sustained basis.'" *Cunningham v. Comm'r of Social Security*, 507 F. App'x 111, 116 (3d Cir. 2012) (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)).

ALJ Zanotto explained her step three determination as follows:

> In making the above determination, the undersigned considered the opinion of the State Agency consultant at Exhibit 1A. The consultant stated the claimant has the following limitations: no limitations in activities of daily living, mild limitations in social functioning and moderate limitations in concentration, persistence or pace. The undersigned assigns some weight to the opinion of the consultant; however, finds the claimant to be more limited in terms of activities of daily living and social functioning based on subsequent evidence received at the hearing level and the claimant's subjective complaints.

> In activities of daily living, the claimant has mild restriction. Records reflect subjective complaints of decreased energy and motivation. Exhibit 7F. However, there was reported improvement with medication including that the claimant "is doing more ADLs and chores around the house." Exhibit 3F/8. Additionally, the claimant reported having shared 50% custody of his two small children who he cares for, spends time with, takes to school and makes sure they are fed and bathed. Exhibit 5E. This shows he has only mild restriction in activities of daily living.

> In social functioning, the claimant has moderate difficulties. The claimant reported that he does not socialize and only goes out

for medical appointments.  Exhibit 5E.  He
and his mother reported the claimant suspects
that people talk about him. Exhibits 4-5E.
Records reflect that upon mental status
examination he intermittently appeared
depressed and anxious.  Exhibits 3F, 7F.
However, records also reflect he was
cooperative upon examination (Exhibits 1F,
6F, 9F) and largely presented with goal
directed thought process, normal thought
content and cognition, no suicidal ideation,
hallucinations or delusions and appropriate
insight and judgment.  Exhibits 3F, 7F, 10F.
Accordingly, based on the claimant's
subjective reports and objective evidence in
the record, the claimant has moderate
limitations in social functioning.

     With regard to concentration,
persistence or pace, the claimant has
moderate difficulties.  The claimant and his
mother reported that he has difficulty
following instructions and cannot pay
attention for long.  Exhibits 4-5E.  Upon
evaluation, it was noted that the claimant's
anxiety and depression did impact
functioning.  Exhibit 1F.  However, objective
findings revealed the claimant had intact
associations, normal insight and memory and
focused attention span.  Exhibits 3F,7F.
Accordingly, the claimant has no more than
moderate limitations in concentration,
persistence or pace.

     As for episodes of decompensation, the
claimant has experienced no episodes of
decompensation, which have been of extended
duration.  Specifically, there appears to be
no prolonged hospitalization or other forms
of treatment to support the existence of
episodes of decompensation.

     Because the claimant's mental
impairments do not cause at least two
"marked" limitations or one "marked"
limitation and "repeated" episodes of
decompensation, each of extended duration,
the "paragraph B" criteria are not satisfied.

(R. 21-22.)

Plaintiff contends that his mental health impairments meet or medically equal the paragraph B requirements when his "overall lifestyle is taken into consideration." (Doc. 9 at 6.) Plaintiff finds fault with the ALJ's determination that he had mild restrictions in activities of daily living, stating that the record "clearly demonstrates" that he suffers from marked restrictions in this category. (Doc. 9 at 7.) In support of this assertion, Plaintiff points to ALJ Zanotto's finding that he "has a decrease in energy and motivation, as well as a continuation of depression and anxiety." (*Id.* (citing R. 21).) Plaintiff adds that "[t]he ALJ heard from Claimant's testimony that Claimant has trouble shopping for himself and performing household chores due to the depression and anxiety." (*Id.* (citing R. 47).) Plaintiff contends the ALJ relied "solely on a small selection of [his] medical records" to reach her conclusion regarding activities of daily living. (*Id.*) He cites the following as evidence that the ALJ "oversimplified" his activities: July 28, 2015, office records from YH BHS/Edgar Square where Plaintiff reported he had difficulty leaving his home and leaving his bed, he had panic attacks that left him unable to function, and he was exhausted following each attack; and his testimony that he often stays in bed for days at a time because of his depressive disorder, leaving his mother to take care of the children when visiting. (Doc. 9 at 8 (citing R. 50,

356).)

Contrary to Plaintiff's assertion, the cited records do not demonstrate that Plaintiff had marked limitations in his activities of daily living. To show a "marked" restriction, Plaintiff must show that his depression and/or anxiety seriously interfered with his "ability to function independently, appropriately, effectively, and on a sustained basis" in his activities of daily living. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)). July 28, 2015, office records indicate that Plaintiff reported that his depression had worsened and he described difficulties he was having *at the time*. (R. 356.) Symptoms described at an isolated office visit do not establish the claimed limitations affected his ability to function "on a sustained basis." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)). Similarly, Plaintiff's cited hearing testimony does not show that he was unable to get out of bed and care for his children "on a sustained basis" in that the records reviewed above show periods of improvement throughout the relevant time period. Thus, the Court concludes Plaintiff has not demonstrated that the ALJ erred in not finding Plaintiff had marked limitations in activities of daily living.

In support of his claim that his "records clearly demonstrate" that he suffers from marked restrictions in his ability to maintain social functioning, Plaintiff cites only his own testimony that he has tried to relieve symptoms of social withdrawal and antisocial

21

behavior "by shopping after busy hours to avoid contact with people, yet even with his best efforts he becomes overwhelmed when performing these activities." (Doc. 9 at 8-9 (citing R. 47).) Plaintiff does not refute the ALJ's reliance on medical records which reflected that Plaintiff was cooperative upon examination and largely presented with goal directed though process, normal thought content and cognition, and appropriate insight and judgment. (R. 21 (citations omitted).) Therefore, he does not show that the ALJ's conclusion regarding moderate difficulties in social functioning is not based on substantial evidence. Moreover, Plaintiff's citation to his own testimony, uncorroborated by mental status examination findings or other evidence of record, cannot satisfy his burden of demonstrating marked limitations in social functioning. Thus, the Court concludes Plaintiff has not demonstrated that the ALJ erred in not finding Plaintiff had marked difficulties in social functioning.

Plaintiff's assertion that the record demonstrates that he suffers from marked difficulties in maintaining concentration, persistence, or pace (Doc. 9 at 9) is similarly deficient. Plaintiff does not refute the ALJ's reliance on objective findings which revealed that Plaintiff had intact associations, normal insight and memory, and focused attention span. (R. 22 (citations omitted).) As found previously, Plaintiff's citation only to his own testimony is insufficient to satisfy his burden of showing that

the ALJ erred in finding moderate difficulties in this area rather than marked limitations.

In order to show the ALJ erred at step three, Plaintiff had to show that the ALJ erred by not finding that Plaintiff had marked limitations in two of the categories reviewed above.[2]  As discussed above, Plaintiff has not satisfied his burden of showing that the claimed error is cause for reversal or remand.

**B.    *Residual Functional Capacity***

Plaintiff maintains that the ALJ erred when she found that he had the RFC to perform light work.  (Doc. 9 at 10.)  Defendant responds that this argument is without merit.  (Doc. 10 at 12.)  The Court concludes Plaintiff has not satisfied his burden of showing the claimed error is cause for reversal or remand.

Plaintiff first states that "the ALJ erred when she determined that Claimant has the residual functional capacity to perform light-duty work, as there was no RFC in the file."  (Doc. 9 at 10.)  As noted by Defendant, this claimed error is without merit in that it is the ALJ's burden to assess a plaintiff's residual functional capacity based on all the relevant evidence of record.  (Doc. 10 at 12 (citing 20 C.F.R. § 404.1545(a)(1)).)

After stating that major depressive disorder, anxiety disorder, attention deficit hyperactivity disorder and obsessive

---

[2]  Plaintiff does not allege that he had repeated episodes of decompensation, each of extended duration.

23

compulsive disorder preclude him from doing any level of exertional work, Plaintiff asserts that the "ALJ failed to consider numerous medical records indicating [his] inability to handle communication between supervisor's [sic], co-workers and customers. Moreover, there is a lack of medical evidence countering [his] testimony as to his physical limitations." (Doc. 9 at 10.) On this basis, Plaintiff concludes the ALJ's RFC determination is not supported by substantial evidence. (*Id.*) This type of general averment does not satisfy Plaintiff's burden of demonstrating error. *Shineski*, 556 U.S. at 409; *Woodson*, 661 F. App'x at 766; *Holloman*, 639 F. App'x at 814. Further, Plaintiff does not identify any physical limitations which should be included in the RFC.

Plaintiff next points to August 20, 2015, office records as supportive of his symptoms and physical limitations. (Doc. 9 at 11.) Specifically, Plaintiff states the "medical examination" of that date "showed Claimant remained to have serious signs of depression, and anxiety despite the use of medication. R. at 353. The examination also indicated that Claimant had been in isolation, with limited motivation to perform work because of the exhaustion brought on from having multiple anxiety attacks. *Id.*" (Doc. 9 at 11.) Plaintiff contends the ALJ ignored these records and instead relied on "subjective facts within the medical records favoring her decision to deny the Claimant benefits," ignoring the "history of present illness (HPI) section within medical records." (*Id.* at 11-

24

12.)

The Court's review of the ALJ's Decision shows that the ALJ did not ignore Plaintiff's subjective complaints contained in the August 2015 records.  Rather, ALJ Zanotto specifically acknowledged worsening symptoms in July and August 2015.  (R. 24.)  She noted that "

> during these periods of reported worsening symptoms, and upon review of the period of alleged disability as a whole, mental status examination findings largely reveal the claimant presented with goal directed thought process, normal thought content and cognition, no suicidal ideation, hallucinations or delusions and appropriate insight and judgment. Exhibits 3F, 7F, 10F. These objective findings are consistent with the ability to perform work within the parameters of the residual functional capacity above.

(R. 24.)  Thus, contrary to Plaintiff's assertion, the ALJ did not rely on "subjective facts" (Doc. 9 at 11) but on examination findings made by Dr. Muneses which are listed as "Objective" in the record (*see* R. 353).  Plaintiff provides no basis to discount the mental "Objective" findings recorded and relied upon by the ALJ.  Therefore, Plaintiff has not shown that the ALJ improperly considered the August 2015 records.

Regarding his claim that medications started in April 2015 and taken through August 2015 did not show a substantial effect on Plaintiff's subjective complaints (Doc. 9 at 11), the alleged lack of improvement over a five-month period is without legal

25

significance.  First, Plaintiff does not address the objective
mental status findings discussed by the ALJ which were recorded
during the same period and which the ALJ found indicative of the
ability to perform work within the RFC assessed (*see* R. 24).  A
review of the record related to office visits from April 2015
through August 2015 shows that objective mental status findings
were within normal limits and appropriate with the exception of
Plaintiff's mood which was generally recorded as depressed or
depressed and anxious (R. 356 360, 362) and on one occasion his
affect was noted to be flat (R. 356).  Further, even if Plaintiff's
alleged symptoms were adequately supported and precluded gainful
employment for the five-month period cited, Plaintiff would not
satisfy the longitudinal requirements for finding disability under
the Act.  42 U.S.C. § 423(d)(1)(A).

Plaintiff's broader claim that records taken from July 28,
2014, through January 9, 2016, "clearly indicated that [his]
depression had remained the same throughout treatment" (Doc. 9 at
12) does not point to error.  First, such a conclusory statement
does not satisfy Plaintiff's burden of showing error on the basis
alleged.  *Shineski*, 556 U.S. at 409; *Woodson*, 661 F. App'x at 766;
*Holloman*, 639 F. App'x at 814.  Further, as evidenced by the
Court's medical evidence review above, Plaintiff's statement
mischaracterizes findings set out in the relevant records.  The
following are examples of improvement reported through the relevant

period: in September 2014 Plaintiff noted improvement in attention and energy and stated he was generally more functional and specifically functioning ok at his job despite reporting increased anxiety symptoms (R. 371); following the report of significant depression in December 2014, Plaintiff reported significant improvement in his mood and outlook in February 2015 following commencing a DBT progrem; after experiencing increased symptoms in April 2015, Plaintiff reported in May 2015 that he had done fairly well since then and found some benefit from the earlier change in medication (R. 359); after reporting increased problems in July and August 2015 (R. 353, 356), Plaintiff did not see a mental health provider for the remainder of the year (*see* R. 377); when he saw a primary care doctor in January 2016 for blood pressure and triglyceride problems, the provider correlated Plaintiff's extreme anxiety with the medical problems (R. 379-80); after a February 4, 2016, medication adjustment by a mental health provider (R. 433), Plaintiff reported that he was doing much better at his February 26, 2016, visit with his primary care provider, attributing the improvement to medication changes (R. 442). This review of the record shows that Plaintiff's claim that his depression remained the same from July 2014 through January 2016 is not an accurate reflection of record evidence during the relevant time period.

Plaintiff next states that Dr. Muneses' Medical Source Statement, which included findings of marked limitations in some categories, should have been given significant weight. (Doc. 9 at

12.)  However, Plaintiff does not address ALJ Zanotto's reasons for assigning the opinion in general partial weight and the marked limitations little weight (*see* R. 25) or otherwise elaborate on why the opinion was entitled to more weight than that assigned by the ALJ.  (Doc. 9 at 12.)  Plaintiff's allegations related to Dr. Muneses' opinion are unsupported and conclusory.  Therefore, they are insufficient to satisfy Plaintiff's burden of demonstrating error.  *Shineski*, 556 U.S. at 409; *Woodson*, 661 F. App'x at 766; *Holloman*, 639 F. App'x at 814.  This conclusion is buttressed by the fact that the ALJ's reasons for assigning the opinion partial weight included her determination that the opinion generally presented only a snapshot of the particular time-period which was not a reliable long-term picture of Plaintiff's mental functioning.  (R. 25.)  As set out in the Court's review of Dr. Muneses' opinion above, Dr. Muneses had the opportunity to indicate that the opinion was for a more extended period than "current limitations only" but he did not do so.  (R. 344.)  Thus, even if properly supported, Plaintiff's reliance on the opinion to establish marked limitations for the required durational period under the Act would be unavailing.

Turning to Plaintiff's assertion that the ALJ "placed into her decision only the records that supported her conclusions to deny benefits" (Doc. 9 at 12), a review of the Decision clearly belies Plaintiff characterization of the evidence reviewed by ALJ Zanotto (*see* R. 21-25).

Finally, Plaintiff asserts that the ALJ needed contrary medical evidence to discount his testimony regarding the limiting effects of his medically determinable impairments. (Doc. 12 at 13.) With this statement Plaintiff overlooks the fact that the ALJ cited to evidence which she found inconsistent with Plaintiff's allegations and the establishment of limitations meeting the Act's durational requirements. (*See* R. 21-25.) Because Plaintiff does not develop this aspect of his opposition to the ALJ's decision, further discussion is not warranted.

## C. *Step Five*

Pointing to Dr. Muneses' findings that he had marked limitations and the VE's testimony that such limitations indicated that Plaintiff would be unemployable, Plaintiff contends the ALJ erred when she determined that other work existed in the national economy that he could perform. (Doc. 9 at 13-14.) Defendant responds that the ALJ's step five determination was proper. (Doc. 10 at 19.) The Court concludes Plaintiff has not satisfied his burden of showing the claimed error is cause for reversal or remand.

An ALJ may err at step five if she failed to include credibly established limitations in her hypothetical question to the vocational expert. *Rutherford* clarifies that an ALJ is not required to submit to the vocational expert every impairment or limitation alleged by a claimant. 399 F.3d at 554. Rather, the hypothetical posed must "accurately convey to the vocational expert

all of a claimant's *credibly established limitations*." *Id.* (citing *Plummer*, 186 F.3d at 431.) Whether a limitation is credibly established is thus the crux of the issue, the next question being whether the ALJ properly discredited the claimed limitation.

Case law and regulations[3] address when a limitation is credibly established. *Rutherford*, 399 F.3d at 554.

> Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response (*Burns*, 312 F.3d at 123). Relatedly, the ALJ may not substitute his or her own expertise to refute such record evidence (*Plummer*, 186 F.3d at 429). Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible—the ALJ can choose to credit portions of the existing evidence but "cannot reject evidence for no reason or for the wrong reason" (a principle repeated in *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993); [20 C.F.R. § 416.]929(c)(4)).

399 F.3d at 554.

Although, in response to a question from Plaintiff's attorney, the VE opined that a hypothetical individual with a marked limitation in his ability to "respond[] appropriately to usual work situations and changes and routine work setting" would be unemployable (R. 61), he rendered no opinion regarding whether Plaintiff had this specific limitation. Rather, this is a limitation which Dr. Muneses found to be a "current limitation[]"

---

[3] *Rutherford* specifically identifies 20 C.F.R. §§ 416.945, 929(c) and 927) as relevant to the inquiry. 399 F.3d at 554.

for Plaintiff as of April 24, 2015 (R. 345) and the ALJ assigned little weight to that finding (R. 25).  The Court concluded above that Plaintiff had not shown error in the ALJ's assessment that Dr. Muneses' marked-limitation findings were entitled to little weight and Plaintiff does not otherwise support his step-five argument. Thus, this is a case where the claimed limitation has some support but is also contradicted by other evidence and the ALJ did not improperly discount the evidence upon which Plaintiff relies.  399 F.3d at 554.  In this scenario, the marked limitation in Plaintiff's ability to "respond[] appropriately to usual work situations and changes and routine work setting" (R. 61) was not a credibly established limitation and Plaintiff has not shown the ALJ erred in not crediting the VE's related testimony.  Thus, Plaintiff has not satisfied his burden of showing that the claimed error is cause for reversal or remand.

## V. Conclusion

For the reasons discussed above, the Court concludes Plaintiff's appeal of the Acting Commissioner's decision is properly denied.  An appropriate Order is filed simultaneously with this Memorandum.


                              S/Richard P. Conaboy
                              RICHARD P. CONABOY
                              United States District Judge

DATED: June 1, 2018